**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> SIDARTH CHAKRAVERTY-1, ) <br> VICTOR ALSTON -2, and ) <br> SHIJING CAO-3 ) <br> ) <br> Defendant. | Case No. 4:24CR489 MTS/SPM |

## MEMORANDUM OPINION AND ORDER

All pretrial matters in the above-referenced case have been referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b). On September 27, 2024, the United States filed its sealed Motion for Inquiry into Potential for Conflict of Interest asking the Court to inquire into the propriety of Attorney Beau Brindley's representation of Defendant Shijing Cao considering his representation of Cao's co-defendant, Victor Alston, and four potential Government witnesses. [ECF No. 19]. In response, Mr. Brindley acknowledged that there were legitimate conflict issues that warranted an inquiry but argued that those conflicts did not prevent him from adequately representing Cao because (1) he no longer represents the potential government witnesses; (2) he obtained conflict waivers from Cao, Alston, and Ruan, the only potential witness with whom he had substantive and privileged communications, and (3) Cao and Ruan and Alston all agreed to the use of an independent, conflict-free attorney to cross examine witnesses who were previously represented by Brindley at trial.

The undersigned held an *ex parte* inquiry of Defendant Cao, three potential government witnesses (Ruan, Thornton, and McKay), and Cao's former attorney, Ryan Hedges. The

undersigned also reviewed email communications provided by the United States and one of the potential government witnesses. *See* Govt. Ex. 1. On February 7, 2025, the Court heard oral arguments from the parties. The Court has carefully considered the entire record related to the conflict inquiry, including witness testimony, the written and oral arguments of counsel, written declarations, other evidence offered by the parties, and the applicable law. For the reasons set out below, the Court finds that, taken together, the conflicts stemming from Mr. Brindley's representation of potential government witnesses, Ms. Cao's co-defendant, Victor Alston, and the third-party payment arrangement disqualify him from ethically representing Ms. Cao at trial.

### A.  Factual Findings

Email communications provided by the United States establish that the FBI's investigation which ultimately led to the charges in this case was underway as of June 2023. *See* Govt. Ex. 1, at p. 1. As part of its investigation, the FBI attempted to interview Defendant Sid Chakraverty. *See id*. At that time, Attorneys for Chakraverty advised AUSA Hal Goldsmith that they represented Chakraverty and his companies and requested that all communications with Chakraverty or "the constituents" of Big Sur Construction and Big Sur Investments be channeled through counsel. *Id.* The emails show that, consistent with that directive, between June 2023 and February 2024, AUSA Hal Goldsmith communicated with attorneys retained by Chakraverty and/or his companies to coordinate interviews and/or grand jury testimony of individuals the government believed had information relevant to the investigation. Among the individuals identified as having relevant information, Goldsmith/FBI sought interviews of Doris Ruan, Hilary Brooke Thornton, and Jeff McKay. Chakraverty and/or his companies retained Attorney Beau Brindley to represent those potential witnesses.

Based on the email communications submitted by the United States, in August 2023, counsel for Sid Chakraverty and the Big Sur related entities advised AUSA Goldsmith that Defendant Victor Alston was being represented by Attorney Talmage Newton. *See Id.*, at p. 13. However, on September 16, 2024, Beau Brindley sent an email to AUSA Goldsmith stating that he had been engaged the day before to represent Alston "with respect to this upcoming indictment." *Id.* at p. 14.[1] Brindley stated Alston was "very angry" and felt "betrayed and misled by his brother and counsel for his brother." *Id.* The email stated Vic is "angry with the directions and consequences that have flowed from a strategy spearheaded by Renato Mariotti . . . on behalf of Sid Chakraverty" and Vic felt he was "collateral damage to his brother's and his brother's lawyer's reckless behavior and destructive strategy." *Id.* Brindley explained Alston was going to "change course and break away from the direction" taken by his brother, Sid Chakraverty, and Brindley was asked to reach out to "find a mechanism by which this can be resolved without [Alston's] indictment." *Id.* In the email, Brindley indicated that "both Doris [Ruan, who he was representing,] and Vic [Alston] [were] prepared to sign necessary waivers of potential conflict to permit this representation." *Id.*

Two days later, on September 18, 2024, Defendants Sidarth Chakraverty, Victor Alston, and Shijing Cao were charged in an indictment with mail fraud and wire fraud. The indictment alleges the defendants and employees acting at defendants' direction, submitted documents containing false information to representatives of the City of St. Louis St. Louis Development Corporation as to the participation and utilization of Minority Business Enterprise and Women Owned Business Enterprise companies on certain redevelopment and construction projects to

---

[1] The email references Vic Chakraverty; however, throughout the inquiry it was clear that Vic Chakraverty and Vic Alston are one in the same.

obtain City tax incentives and property tax abatements. Although it is not entirely clear when his representation of Ms. Cao began, Beau Brindley entered his appearance on behalf of Defendant Cao on September 23, 2024.[2]

On November 7, 2024, Alston submitted a waiver of potential conflict of interest acknowledging that, immediately before the return of the indictment, he asked Brindley to speak to the government on this behalf to delay or prevent his indictment in the case. *See* ECF No. 66-3. He stated he chose alternative counsel when those negotiations were unsuccessful. *Id.* at ¶2. In the waiver, Alston denied that he disclosed any privileged information to Brindley during his brief representation of him and stated they had no substantive discussions of the facts of the case. *Id.* at ¶4. Alston stated he reviewed the document with his attorney, who is not associated with Brindley, or his firm and he waived any legal claim he might otherwise have as a result of Brindley representing his co-defendant, Ms. Cao. *Id.* at ¶6. Alston consented to being cross examined by an independent attorney who does not have access to any privileged or confidential information that may have been provided to Mr. Brindley or his firm. *Id.* at ¶7.

   1. *Shijing Cao*

Before she was charged in the indictment with the instant offenses, Defendant Cao was an accounting manager for Olympus PR, LLC, a company owned by co-defendants, Victor Alston and Sid Chakraverty, and perhaps others. Cao reported directly to Alston and Raghavan Chakraverty (not Defendant Sid Chakraverty). Cao testified that when she received a subpoena or other notice from the FBI about the investigation, her employers hired Attorney Sandy Boxerman to represent her. Cao confirmed that, consistent with email communications presented by the

---

[2] On September 27, 2024, Attorney Joel Schwartz appeared on behalf of Defendant Alston.

United States, she agreed to an interview or proffer session with the government in July/August of 2023. However, after she learned she was going to be a target of the investigation, and not just a "subject," the company had Attorney Ryan Hedges reach out to her. She explained that Hedges had previously been a government lawyer and had more experience than Boxerman. She stated she initially wanted to keep both attorneys; however, when she learned she could not do that she ultimately decided to go with Hedges. As with Boxerman, Cao's employer paid Hedges for his representation of Cao.

Hedges apparently represented Cao from early August 2023, until shortly before the indictment was returned on September 18, 2024.  When asked what happened with Mr. Hedges—i.e., why Mr. Hedges stopped representing her, Cao was not sure. She testified, "Well, I think he was no longer able to represent me. I'm not sure on the details." Cao testified that when Hedges stopped representing her, Beau Brindley reached out to her, presumably at the request of her employers. Cao testified that, after speaking with him a few times, she became comfortable with Brindley representing her because he had worked with Doris Ruan, who is a friend. Brindley, like Cao's previous attorneys, was also paid by Cao's employers. Cao and conflict-free counsel informed the Court that Cao had been advised of the ethical limitations Mr. Brindley would face given his prior representation of Ms. Ruan and the other witnesses. The Court reviewed Ms. Cao's conflict waiver and supplemental conflict waiver with Ms. Cao, and she affirmed her waiver of substantial rights as reflected in the written waivers. Cao indicated her decision to accept representation by a lawyer with so many limitations on his ability to zealously represent her was based, in part, on advice from her husband that an individual (or retained) lawyer is better than a court-appointed lawyer.

On January 7, 2025, Cao appeared at the *ex parte* inquiry of her former attorney, Ryan Hedges. After being reminded that she was still under oath, Cao testified that she intended to re-engage Mr. Hedges to represent her considering the conflict issues that have been revealed in the inquiry. Mr. Hedges confirmed that he was in the process of being retained, that there was paperwork that needed to be completed, that he expected that he would enter his appearance in the near term and there would be no need for the Court to rule on the conflict issue. However, on January 17, 2025, Brindley filed a Status Report stating, among other things, that Ms. Cao has chosen to not proceed with Attorney Hedges at this time because she would prefer to force this Court to rule on the conflict issue and, thereby, create a possible basis to appeal. *See* ECF No. 109.

2. ***Doris Ruan***

At the time of the inquiry, Ms. Ruan was working as an accountant for Big Sur Construction, reporting to Defendants Sid Chakraverty and Victor Alston. She testified that she was contacted by an FBI agent during the pre-indictment investigation. She went to her superiors at Big Sur Construction to ask if she was in trouble and they offered to get her a lawyer. Her superiors referred her to Attorney Ryan Hedges. Later, when someone (either the Government or the other party) said Hedges would have a conflict representing both Ruan and Cao, her superiors at Big Sur Construction found her another attorney—Beau Brindley. She entered a contract with Brindley to represent her as a witness in the Government's investigation; however, per their agreement, Brindley was paid by someone else—she presumed Big Sur.

Based on emails produced by the government, Brindley began representing Ruan around September 12, 2023, and was making inquiries on her behalf fourteen days before the indictment was returned on September 18, 2024. Despite Brindley's statements that he no longer represented any of the potential witnesses including Ruan, Ruan testified during the inquiry that she still

considered Brindley to be her attorney; that Brindley never terminated his representation of her; that it was her expectation that if she were called to testify as a witness at trial Brindley would represent her; and she had spoken with Brindley as recently as the day before her inquiry.

It is clear from Ruan's testimony during the inquiry, the parties' written submissions, and oral arguments, that Ruan is a material and key witness in the prosecution of Cao, Chakraverty, and Alston. Ruan testified that, during the investigation, she was reluctant to appear before the Grand Jury despite assurances by the government that she was not a target. Eventually, Ruan was granted immunity and she testified to the Grand Jury. In preparation for her testimony before the Grand Jury, Ruan met with Brindley and Chakraverty's attorney, Renato Mariotti. Ruan later shared with Brindley the kinds of questions she was asked and the answers she gave during her Grand Jury testimony.

Ruan testified that Brindley presented her with the form Waiver of Conflict and explained its contents to her. The waiver is dated September 26, 2024. *See* ECF No. 60-2. In it, Ruan acknowledged that Brindley represented her during the investigation and that there could be a potential conflict with him now representing Ms. Cao, but she was agreeing to give up any claim she might have arising from Brindley's representing Ms. Cao. *Id.* at ¶4. The waiver also states that while Ruan understands that any information she provided to Mr. Brindley or his firm about herself or the case will be kept confidential, she was agreeing to "waive any future claim [she] might have that privileged information [she] shared with Mr. Brindley or his firm, was not kept confidential during his representation of Ms. Cao." *Id.* at ¶5. The waiver further states that Ruan was given the opportunity to confer with an independent attorney, but she chose not to do so. *Id.* at ¶6. The waiver also states Ruan understood that if called to testify as a witness against Ms. Cao she may be cross-examined by an independent attorney who does not have access to

any privileged or confidential information she provided to Mr. Brindley or his firm and that, by signing the waiver, she fully consented to this procedure despite Brindley's representation of her during the investigation of the case." *Id.* at ¶8.

During the inquiry, Ruan testified she understood that Brindley was going to represent Cao and could potentially disclose privileged communications he acquired through his representation of Ruan. She stated she understood the waiver meant she was not going to raise any legal issue with him because of his representation of Cao. When asked what she understood it meant to "agree to give up any claim I might have about a conflict of interest arising from Mr. Brindley and his firm representing Ms. Cao" Ms. Ruan stated, "I don't know" and indicated she really did not understand. She stated she agreed to the waiver because she and Cao were friends, and she wanted to be helpful to her.

At the close of the inquiry of Ms. Ruan, her conflict-free counsel opined that based on his review of the record and discussions with Ms. Ruan, he believed she generally understands the nature of the waiver but does not understand the scope and extent of the waiver in terms of how Mr. Brindley will behave (where his loyalty will lie) in the event the matter goes to trial. Conflict-free also opined that Brindley could not ethically represent both Ruan and Cao.

### 3. Hilary Brooke Thornton

At the time of the inquiry, Ms. Thornton was working as an interior designer for Big Sur Construction reporting to Defendants Sid Chakraverty and Victor Alston. Ms. Thornton learned there was an investigation into activities related to Big Sur Construction around October of 2023 when Renato Mariotti introduced himself to a group of employees including Ms. Thornton. He alerted them about the investigation and told them to reach out if they had any questions. Ms. Thornton testified she was never directly approached by any investigators, was never asked if she

would be willing to speak with the government, and never asked for an attorney. She testified that she was told, in a group, that because of what was going on with the company they were going to get lawyers to make sure everyone was protected.

Following that announcement, she was contacted by Mr. Brindley who introduced himself, spoke with her in general terms about the investigation, and told her he would try to get her more information about what was going on, and get back to her. She never heard from Brindley again. Ms. Thornton denied ever seeing any of the emails sent from AUSA Goldsmith to Brindley inquiring about her willingness to testify before the Grand Jury and denied that Brindley or any lawyer ever asked her if she was willing to testify.  Thornton reviewed emails sent by AUSA Goldsmith to Brindley in early November 2023. Although Thornton did not remember seeing the emails from Goldsmith, she did recall being shown emails involving the same or similar subject matter by a group of attorneys. Thornton did not believe Brindley himself was present but could not say if someone from his office was or was not present. The attorneys showed emails to Thornton and other employees and asked them what they knew about the information contained in the emails. Thornton acknowledged that the information she provided to the attorneys in response to the emails she was shown is the same information she would give if asked about those records, under oath, at trial.

Thornton was unsure that she entered a formal engagement with Brindley but stated Sid Chakraverty provided her with a document to sign and explained "this is just making sure you guys are protected and have representation." Based on her limited communication with Brindley, Thornton believed he was representing her but is unclear about how the relationship started and was unsure if it ever ended. She did not pay him for his services. She denied that Brindley or

anyone from his office ever told her the relationship was terminated and was unsure if he would represent her if she were called to testify as a witness at trial.

   4. *Jeff McKay*

Jeff McKay is a self-employed materials supplier in the construction industry. McKay acted as a buyer's agent or consultant for Big Sur Construction-related projects. His job was to assist in locating materials needed for various projects. McKay testified that he was unaware of any investigation into Big-Sur Construction or its related companies until Sid Chakraverty invited him to lunch to discuss another project he had coming up. But, when McKay showed up to the meeting location, it turned out to be a lawyer's office. Once there, McKay was questioned by a male and female lawyer about what he did and his involvement in various projects and about his knowledge of two-party checks. McKay does not believe Brindley was one of the attorneys he met with.

Sometime after the meeting McKay received a voicemail from the FBI that he ignored, believing at the time the calls were bogus. Beau Brindley contacted him on or around August 19, 2023. Although he is unsure of what triggered the call from Brindley, McKay believes Sid Chakraverty directed Brindley to contact him. McKay spoke by phone with Brindley about three or four times between August 19-24, 2023. In the first call, Brindley told McKay he had been asked to represent him and that Brindley's fees would be paid by Sid Chakraverty. Brindley sent McKay an engagement letter reflecting their agreement that Brindley would represent McKay in connection with the investigation of Big Sur Construction, and his fees would be paid by authorization of Sid Chakraverty. McKay acknowledged that he and Brindley discussed documents forwarded from AUSA Goldsmith in August of 2023 and that he shared with Brindley his involvement and his knowledge of joint checks. McKay testified that Brindley never formally

terminated the representation, and McKay did not have any communications with Brindley after August 24, 2023. However, McKay did not have any expectation that Brindley continued to be his attorney as of the date of the inquiry.

During the inquiry, McKay was shown emails from AUSA Goldsmith to Brindley dated January 30, 2024, reflecting communications in 2021 between McKay and Defendant Cao in which McKay appears to question why he was being sent a joint check. McKay acknowledged that he sent and received the emails but denied that Brindley ever shared those emails with him.

### 5. *Ryan Hedges*

Ryan Hedges appeared with Defendant Cao and her conflict-free attorney on January 7, 2025, and advised that after consulting with her conflict-free attorney, Defendant Cao had decided to engage Hedges to represent her. Cao confirmed her decision on the record. Hedges advised that he had previously represented Ms. Cao and that representation appears to have continued until the indictment was returned. Hedges acknowledged he previously had been hired by one of the Chakraverty companies to represent Doris Ruan but denied ever having any discussions with Ruan about the substance of the case.

Hedges stated he was representing Cao when she first entered into the Joint Defense Agreement with Cao's co-defendants, Sid Chakraverty and Victor Alston. He stated that the agreement was verbal and that neither the Joint Defense Agreement nor the third-party payment arrangement would require disclosure of information that would otherwise be confidential or privileged. Hedges stated he expected to enter his appearance in a matter of days. However, he never did. Instead, on January 17, 2025, Brindley entered the Status Report regarding Counsel of Choice discussed above.

## II. LEGAL CONSIDERATIONS AND CONCLUSIONS

Based on the foregoing factual findings, Cao, Doris Ruan, Jeff McKay, and Hillary Brooke Thornton were employed by or contracted with companies owned by Defendants Sid Chakraverty and his brother, Victor Alston. During its investigation, the FBI and prosecutor Hal Goldsmith identified Ruan, McKay, and Thornton as people with relevant and potentially incriminating information about the conduct charged in the indictment. After learning that the FBI wanted to interview these three potential witnesses, Sid Chakraverty or his related companies hired Beau Brindley to represent them in connection with the FBI's investigation. Brindley spoke with McKay and Thornton only a few times but through those interactions would have learned what each witness's role was vis-à-vis the companies under investigation, including what they knew about joint checks—a central issue in the government's case. Brindley's interactions with Ruan were more prolonged. He represented her for nearly a year and, during that representation, helped her to secure a grant of immunity when she testified before the Grand Jury. Together with Chakraverty's attorney, Renato Mariotti, Brindley also helped Ruan prepare for her Grand Jury testimony.

Although Brindley represented to the Court that he terminated his relationship with each of these potential government witnesses, during the inquiry, Ruan testified she believed Brindley was still her attorney and would represent her if she were called to testify at trial. In fact, she stated she had spoken with Brindley the day before the inquiry. During the inquiry, McKay had no expectation that Brindley still represented him but stated Brindley had never formally terminated the representation (in the manner called for in the engagement letter). Finally, Ms. Thornton testified she was unsure if Brindley still represented her.

The factual findings demonstrate that, in addition to the three potential government witnesses discussed above, Brindley was hired to represent Defendant Victor Alston two days before the indictment was returned. About one week after the indictment was returned, Brindley entered his appearance on behalf of Defendant Shijing Cao. The government's motion for a conflict inquiry followed. Although Brindley stated he believed an inquiry was proper, he has insisted that the government's motion is little more than an attempt to deprive Ms. Cao of her constitutionally protected right to her counsel of choice and it would be structural error to grant the government's request to disqualify him.[3]

A non-indigent criminal defendant's Sixth Amendment rights encompass the right to be represented by the counsel selected by the defendant. *See generally United States v. Gonzalez–Lopez,* 548 U.S. 140 (2006); *see also Wheat v. United States,* 486 U.S. 153, 159 (1988); *United*

---

[3] Based on the record before the Court, Cao's current choice of Brindley as counsel seems more like litigation gamesmanship and less like a defendant's exercise of a constitutionally protected right to be represented by the counsel selected by the defendant. Cao testified that when she first learned about the FBI's investigation, her employers hired Attorney Sandy Boxerman to represent her. After she learned she was going to be a target and not just a "subject" of the investigation, the company had Attorney Ryan Hedges reach out to her. Although she wanted to keep both Hedges and Boxerman as her attorneys, she ultimately decided to go with Hedges because of his experience as a previous government lawyer. Hedges apparently represented Cao from early August 2023, until shortly before the indictment was returned on September 18, 2024. Cao testified she does not know why Hedges stopped representing her. After Hedges stopped representing Cao, Brindley reached out to her presumably at her employers' request. She got comfortable with him representing her after talking to her friend and potential government witness Doris Ruan, who Brindley also represented. On January 7, 2025, as part of this Court's inquiry, Cao appeared at Hedges' *ex parte* inquiry and testified under oath that she intended to re-engage Mr. Hedges to represent her considering the conflicts faced by Brindley. Hedges confirmed that he was in the process of being retained, that there was paperwork that needed to be completed, that he expected that he would enter his appearance in the near term and there would be no need for the Court to rule on the conflict issue. In a subsequent filing, Brindley notified the Court that Cao was sticking with him after all because, among other reasons, she wished to force a ruling by this Court on the conflict issue and, thereby, preserve grounds for an appeal. Because the parties have not briefed the issue of what constitutes a party's preferred attorney under circumstances such as these the undersigned will assume for the purposes of this conflict inquiry that Brindley is Cao's preferred attorney.

*States v. Gonzalez–Lopez,* 548 U.S. 140 (2006). However, the right to retain counsel of defendant's choosing is not absolute, *Gonzalez–Lopez,* 548 U.S. at 152, because the purpose of the Sixth Amendment is to guarantee "an effective advocate for each criminal defendant," not to guarantee the counsel defendant prefers. *Wheat,* 486 U.S. at 159. This guarantee of effective assistance of counsel "includes the right to the assistance of counsel unhindered by a conflict of interest." *United States v. Agosto,* 675 F.2d 965, 969 (8th Cir.1982) (internal quotation marks and citations omitted), *overruled on other grounds by Flanagan v. United States,* 465 U.S. 259 (1984).

When conflicts of interest exist, a court may disqualify the conflicted attorney. *See Agosto,* 675 F.2d at 969–70. If the court finds the conflict impairs the ability of a criminal defendant's chosen counsel to conform with the Code of Professional Responsibility, the court may decline a proffer of waiver and, after inquiry, insist on separate counsel. *Wheat,* 486 U.S. at 162. *See also United States v. Grady,* 88 F. 4th 1246, 1264 (8th Cir. 2023) (holding the court must "take adequate steps to ascertain whether the conflicts warrant separate counsel").  "The need for fair, efficient, and orderly administration of justice overcomes the right to counsel of choice where an attorney has an actual conflict of interest, such as when he has previously represented a person who will be called as a witness against a current client at a criminal trial." *United States v. Ross,* 33 F.3d 1507, 1523 (11th Cir. 1994) (citing *United States v. Casiano,* 929 F.2d 1046, 1052 (5th Cir.1991)), *overruled on other grounds* in *Crawford v. Washington,* 541 U.S. 36 (2004). Under those circumstances, when an actual conflict of interest exists, the client is denied effective assistance of counsel, and the attorney may be disqualified. *Ross,* 33 F.3d at 1523 (citing *United States v. Martinez,* 630 F.2d 361, 362 (5th Cir.1980), *cert. denied,* 450 U.S. 922 (1981)). As the Supreme Court has recognized, "the court should not be required to tolerate an inadequate representation of a defendant." *Wheat,* 486 U.S. at 162.

There is no real dispute that Brindley's pre-indictment representation of Alston, Ruan, McKay, and Thornton creates a potential concurrent conflict of interest that will materially limit Brindley's ability to adequately represent Ms. Cao in violation of Missouri Rule of Professional Conduct, 4-1.7.[4] Nor can it be denied that Brindley's pecuniary interest in continued payment by Cao's co-defendants, Alston and Chakraverty, also creates a potential conflict of interest under Missouri Rule of Professional Conduct, 4-1.8.[5] However, Brindley contends these potential conflicts do not prevent him from adequately representing Cao because he obtained written conflict waivers from Cao, Ruan, and Alston. Brindley also suggests that any concerns about conflicts stemming from his prior representation are ameliorated because Cao, Ruan, and Alston have agreed to the use of an independent, conflict-free attorney to cross examine them and any other witnesses who were previously represented by Brindley at trial. Finally, Brindley relies on cases such as *Noe v. United States,* 601 F.3d 784 (8th Cir. 2010), to support the argument that any

---

[4] Missouri Rule of Professional Conduct 4-1.7 provides:

> [A] lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if…(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by a personal interest of the lawyer.

[5] Rule 4-1.8 of the Missouri Rules of Professional Conduct provides:

> (f) A lawyer shall not accept compensation for representing a client from one other than the client unless:
> (1) the client gives informed consent;
> (2) there is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship; and
> (3) information relating to representation of a client is protected as required by Rule 4-1.6.

concerns this Court may have of a conflict stemming from the fact that his fees are being paid by an entity aligned with Cao's co-defendants should be allayed by Cao's knowing and voluntary waiver of an independent, conflict-free attorney. Brindley's arguments lack merit for several reasons.

First, the Court is not persuaded that Ruan fully comprehended the scope of her conflict waiver. At the time the waiver was presented to Ruan, she believed Brindley was representing her and declined to confer with an independent attorney about the waiver. At the inquiry, Ruan testified Brindley was still her lawyer and would represent her if she were called to testify at trial. This testimony is at odds with Brindley's representations to the court that he had terminated his representation of Ruan and with the statement in the waiver that Ruan consented to be cross examined at trial by an independent attorney. Other than an understanding that the waiver would help her friend, Ms. Cao, and likely not harm her (considering she was previously granted immunity by the government) it is not at all clear that Ruan's consent was informed such that she understood the material risks or available alternatives Brindley proposed.

Even if the Court accepted Ruan's waiver, the waivers submitted by Brindley including waivers from Cao and Alston are not sufficient to allay the conflicts stemming from counsel's myriad entanglements in this case. *See Grady,* 88 F.4th at 1265-66 (holding district court was within its discretion to deny defendant's motion for substitution of Brindley as counsel "because of the attorney's myriad entanglements" in the case). In *Wheat*, the Supreme Court addressed a question similar to that presented in the present case—"the extent to which a criminal defendant's right under the Sixth Amendment to his chosen attorney is qualified by the fact that the attorney has represented other defendants charged in the same criminal conspiracy." *Id.* at 159. The Court rejected the proposition that "waivers by all affected defendants [necessarily]

cures any problems created by the multiple representation." *Id.* at 160. Rather, the Court affirmed a district court's discretion to reject or accept a waiver of a conflict of interest, based on the informed judgment of the court, after an evaluation of the facts and circumstances of a particular case. *Id.* at 164.

In *Wheat*, the Court recognized that, in the pretrial context, the relationships between defendants "are seen through a glass, darkly" and the "likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials." *Id.* The Court further recognized, "[a] few bits of unforeseen testimony or a single previously unknown or unnoticed document may significantly shift the relationship between multiple defendants. These imponderables are difficult enough for a lawyer to assess, and even more difficult to convey by way of explanation to a criminal defendant untutored in the niceties of legal ethics." *Id.* at 162-63. Therefore, district courts are given "substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or not burgeon into an actual conflict as the trial progresses." *Id.* at 163.

Admittedly this case is in the early stages, however, based upon this Court's inquiry, the likelihood that potential conflicts stemming from Mr. Brindley's pre-indictment representations of potential government witnesses will burgeon into an actual conflict as the trial progresses is quite high. As the foregoing factual findings demonstrate, Brindley represented Doris Ruan, a key government witness, in connection with her testimony before the Grand Jury. Based on the record before this Court, if the case progresses to trial it is almost certain Ruan will be called to testify against all three defendants, including Brindley's client, Ms. Cao. In fact, it was in recognition of the inherent conflict that would exist if, as anticipated, Ms. Ruan testified against

Ms. Cao at trial that Mr. Brindley obtained a potential conflict waiver from Ruan and proposed that, as a prophylactic measure, he be allowed to use an independent conflict-free attorney to cross examine Ruan (and any other witness he previously represented) at trial.

Although he has attempted to downplay conflicts arising from his representations of other potential government witnesses, Mr. Brindley's entanglements in this case go well beyond his representation of Doris Ruan. Brindley's entanglements include a brief representation of a co-defendant whose interests may or may not be averse to Cao's in the future and his prior representation of at least three potential witnesses other than Ruan. Two of those potential witnesses, McKay and Thornton, appear to have a high likelihood of being called to testify at trial because they have knowledge that is relevant and material to the prosecution's case. None of the witnesses other than Ruan have provided a conflict waiver. Based on the Court's inquiry, at least one of those witnesses, McKay, had privileged communications with Brindley about the case and has information that would likely be averse to Cao's defense. Even if Brindley secured waivers from McKay and Thornton, the idea that Brindley has proposed having a separate independent conflict-free attorney cross examine no less than three government witnesses at trial underscores how untenable Brindley's proposed prophylactic measure is and how diminished his ability to adequately represent Ms. Cao would be if were permitted to remain as her counsel.

Finally, Brindley's entanglements in this case include his pecuniary interests and the extent to which those interests might interfere with his independence and/or his ability to adequately represent his current client, Ms. Cao. For example, the factual findings demonstrate that during the government's investigation Brindley was paid by co-defendant Sid Chakraverty or one of his companies to represent Ruan, Thornton, and McKay after they were identified as potential government witnesses. Based on email communications provided by the government,

Brindley told the prosecutor that McKay and Thornton declined to be interviewed even though, based on the testimony of those witnesses at the inquiry, it appears that Brindley may have intentionally failed to pass along the government's request for an interview and documents related to the investigation. Based on the factual findings, Brindley may have already acted in a way that was more aligned with the interests of his payers, Ms. Cao's codefendants/former employers, than the interests of his clients. These facts and the substantial actual conflicts at issue previously discussed distinguish this case from the facts of *Noe v. United States,* 601 F.3d 784 (8th Cir. 2010) (holding defendant waived any potential conflict arising from a third-party payment to defendant's counsel) and *Wood v. Georgia,* 450 U.S. 261 (1981) (holding third party payment was not basis for disqualification absent an actual conflict).

For the foregoing reasons, this Court finds that, after inquiry, Mr. Brindley's substantial actual and potential conflicts of interest in this case will impair his ability to conform with the Code of Professional Responsibility and will impair this Court's interest in the fair, efficient, and orderly administration of justice. As such, this Court declines as inadequate Cao's proffered waivers and proposed prophylactic measure of using an independent attorney to conduct cross examinations at trial. *See Wheat,* 486 U.S. at 162; *see also United States v. Grady,* 88 F. 4th at 1264. The Court must now insist that Cao engage a separate, conflict-free attorney.

Accordingly,

**IT IS HEREBY ORDERED** that the United States' Motion for a Conflict Inquiry and to Disqualify Attorney Beau Brindley [ECF Nos. 19, 70 & 72] is **GRANTED**. Mr. Brindley and his law firm are disqualified from further representation of Defendant Shijing Cao.

**IT IS FURTHER ORDERED** that Defendant Cao must engage substitute conflict-free counsel and substitute counsel must enter no later than **February 26, 2025**. If Defendant Cao is

unable to afford substitute counsel, she may request that the Court appoint an attorney under the Criminal Justice Act.

**IT IS FURTHER ORDERED** that the Court will hold a case status hearing in **Courtroom 13 South** on **February 26, 2025, at 10:30 a.m.** to set new pretrial motion deadlines and receive other status updates in the case. Defendant Cao and/or her substitute counsel must attend. Counsel for the remaining defendants and the United States must also attend.

**IT IS FINALLY ORDERED** that conflict-free counsel appointed to represent Defendant Cao during the Court's inquiry is excused from all further proceedings in this case.

Dated: February 12, 2025.

_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE